## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

—————————————————————— )
**LETICIA E. LONG,**                                )
                                                    )
    **Plaintiff,**                          )
                                                    )
      **v.**                            )          **Case No. 16-cv-00026 (APM)**
                                                    )
**ENDOCRINE SOCIETY,**                              )
                                                    )
    **Defendant.**                          )
—————————————————————— )

## MEMORANDUM OPINION

### I.    INTRODUCTION

Plaintiff Leticia E. Long alleges that her former employer, Defendant Endocrine Society, improperly terminated her employment while she was out on approved leave to care for her mother. Plaintiff claims Defendant interfered with and retaliated against her for taking leave, in violation of the federal Family and Medical Leave Act, 29 U.S.C. § 2601, et seq., and the D.C. Family and Medical Leave Act, D.C. Code § 32–501, et seq. Plaintiff further alleges that Defendant failed to pay her overtime compensation, in violation of the Fair Labor Standards Act, 29 U.S.C. § 201, et seq., the D.C. Minimum Wage Revision Act, D.C. Code § 32–1001, et seq., and the D.C. Wage Payment and Collection Law, D.C. Code § 32–1301, et seq. Defendant moves for summary judgment on the grounds that it terminated Plaintiff because Plaintiff performed poorly over an extended period of time and misused company time and resources by operating two outside businesses during work hours. Additionally, Defendant contends that Plaintiff was an exempt administrative employee and, therefore, not entitled to overtime compensation. *See* Def.'s Mot. for Summ. J. & Stmt. of Material Facts, ECF No. 20, at 1–40 [hereinafter Def.'s Mot.].

Based on the record evidence, the court concludes that no reasonable jury could find that Defendant retaliated against Plaintiff for taking FMLA leave or that Defendant interfered with Plaintiff's right to take leave.   The court also finds that Defendant properly classified Plaintiff as an exempt employee, making her ineligible for overtime compensation.   Accordingly, the court grants summary judgment in favor of Defendant on all counts.

## II.   BACKGROUND

### A.      Factual Background

Plaintiff worked as a publications marketing manager for Defendant from July 2011 to January 2015.   Pl.'s Opp'n to Def.'s Mot. for Summ. J., ECF No. 23, Pl.'s Mem. in Supp., ECF No. 23-1 [hereinafter Pl.'s Opp'n], Pl.'s Stmt. of Material Facts, ECF No. 23-2, at 5–14 [hereinafter Pl.'s Stmt.], ¶¶ 73, 96; Def.'s Mot. for Summ. J. & Stmt. of Material Facts, ECF No. 20, at 41–54 [hereinafter Def.'s Stmt.], ¶ 68; Pl.'s Resp. to Def.'s Stmt., ECF No. 23-2, at 1–5 [hereinafter Pl.'s Resp.], ¶ 68.   The Endocrine Society is a professional membership organization dedicated to the research, study, and clinical practice of endocrinology—the branch of physiology and medicine related to glands and hormones.   Pl.'s Stmt. ¶ 71; Def.'s Reply in Supp. of Mot. for Summ. J., ECF No. 24 [hereinafter Def.'s Reply], at 32–40 [hereinafter Def.'s Resp.], ¶ 71; Def.'s Mot., Def.'s Exs., ECF 20-1 [hereinafter Def.'s Exs.], at 45–99 [hereinafter Def.'s Ex. 7], at 1.[1] The organization's members consist primarily of medical doctors, scientists, clinical researchers, and educators.   Def.'s Ex. 7 at 1.   The Endocrine Society publishes peer-reviewed journals, hosts conferences and meetings, and develops clinical practice guidelines, in addition to other work.   *Id.* at 1–2.   Plaintiff's responsibilities at the Endocrine Society included securing subscriptions and renewals to the organization's journals, preparing profit and loss statements for new publications

---

[1] All pin citations to Defendant's Exhibits reference the original pagination of each Exhibit.

and educational products, creating and implementing marketing plans, and managing the marketing department's budget.  Def.'s Stmt. ¶ 2; Pl.'s Resp. ¶ 2; Def.'s Exs. at 20–23 [hereinafter Def.'s Ex. 3]; Pl.'s Opp'n, ECF No. 23-12 [hereinafter Pl.'s Ex. 10], at 85–93.[2]

    *1. Plaintiff's Performance Issues*

  In 2013, Plaintiff's work performance began to decline.  As early as mid-2013, Plaintiff's immediate supervisor, marketing director Meredith Jannsen, observed that Plaintiff's work quality was sub-par:  Plaintiff was not completing marketing plans, her writings contained numerous errors, and she needed guidance from managers to do basic projects.  Def.'s Exs. at 33–44 [hereinafter Def.'s Ex. 6], at 52–53; Def.'s Exs. 153–62 [hereinafter Def.'s Ex. 13].  According to Jannsen, Plaintiff's work quality continued to deteriorate in early 2014, causing other employees to complain about Plaintiff's failure to follow through on various tasks and forcing Jannsen to shoulder many of Plaintiff's responsibilities.  Def.'s Ex. 6 at 56–57; Def.'s Exs. at 140–46 [hereinafter Def.'s Ex. 10]; Def.'s Ex. 12; Def.'s Exs. at 193–95 [hereinafter Def.'s Ex. 18]; Def.'s Exs. at 207–26 [hereinafter Def.'s Ex. 24].  In May 2014, Jannsen met with Plaintiff to discuss these performance issues and, thereafter, Jannsen began documenting her concerns and working with Human Resources ("HR") to address them.  Def.'s Stmt. ¶ 18; Pl.'s Resp. ¶ 18; Def.'s Ex. 6 at 57–59; Def.'s Ex. 10.

  Plaintiffs' job performance did not improve.  Throughout the fall of 2014, Jannsen and Wendy Sturley, Defendant's senior marketing director, met multiple times to discuss Plaintiff's performance and raised the possibility of termination.  Def.'s Ex. 6 at 74–75; Def.'s Stmt. ¶ 35; Pl.'s Resp. ¶ 35.  Jannsen also continued to coordinate with HR, documenting examples of Plaintiff's inferior work.  Def.'s Exs. at 204–28 (Exs. 23–25).  On October 8, 2014, Jannsen again

---

[2] All pin citations to Plaintiff's Exhibits reference the original pagination of each Exhibit.

met with Plaintiff to discuss her ongoing performance issues, and two days later, sent her an e-mail recapping the meeting and attaching a list of projects on which to focus. Def.'s Stmt. ¶ 30; Pl.'s Resp. ¶ 30; Pl.'s Ex. 10 at 105–06; Def.'s Exs. 163–72 [hereinafter Def.'s Ex. 14]. The e-mail stated: "As we discussed, we were hoping to start fresh on all of these projects and get you to a place where you were able to perform the duties required of the position including taking ownership and initiative for the planning and implementation of marketing efforts related to journals and [publications]." Def.'s Ex. 14 at 2.

### 2.  *Plaintiff's Leave Requests*

Meanwhile, throughout 2014, Plaintiff's parents experienced serious health problems, causing her to periodically seek leave under the federal Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, et seq. Def.'s Ex. 6 at 67–68. Plaintiff's father passed away in late September 2014, and Plaintiff returned to work in October. Pl.'s Ex. 10 at 103–04. That same day she returned, October 10, 2014, Plaintiff requested 30 days of family leave to care for her mother. Defendant approved the request, and Plaintiff took a 24-day leave from October 14, 2014, through November 13, 2014. Def.'s Stmt. ¶¶ 32–33; Pl's Stmt. ¶¶ 32–33.

Plaintiff made two requests for FMLA leave in December 2014, the second of which forms the basis of her claims here. Plaintiff sought and received FMLA leave on December 15 and 16, 2014. Def.'s Stmt. ¶ 48; Pl.'s Resp. ¶ 48. The following day, on December 17, 2014, Plaintiff requested 60 days of leave to care for her mother, from January 20, 2015, to March 17, 2015. Def.'s Stmt. ¶¶ 49–50; Pl.'s Resp. ¶¶ 49–50; Def.'s Exs. at 244–45 (Ex. 30). On December 19, 2014, Sturley reported that Plaintiff stormed into her office in a confrontational manner. Def.'s Exs. at 248–51 (Ex. 32). In an e-mail to HR Director Julie Boynton, Sturley described her interactions with Plaintiff as growing "more and more frustrating" and sought guidance on how to

4

handle the situation.  *Id.*  A few days later, on December 22, 2014, Plaintiff requested 12 weeks of leave to begin immediately, which was approved.  Def.'s Exs. at 252–62 (Ex. 33).

### 3.    Termination of Plaintiff's Employment

While Plaintiff was on leave in December 2014, Jannsen monitored Plaintiff's work e-mail account.  Def.'s Stmt. ¶ 56; Pl.'s Resp. ¶ 56; Def.'s Ex. 6 at 76–77.  When Jannsen went out on vacation, Sturley, the senior marketing director, took over that task.  Def.'s Exs. at 24–29 [hereinafter Def.'s Ex. 4], at 65–66.  Sturley discovered multiple e-mails written to and from Plaintiff's work account relating to two outside businesses—Wired Cycling, a cycling studio Plaintiff founded in northeast Washington, D.C., and Long & Associates, LLC, Plaintiff's husband's law firm.  Def.'s Stmt. ¶ 57; Pl.'s Resp. ¶ 57; Def.'s Ex. 4 at 67, 69–71; Def.'s Exs. at 100–11 [hereinafter Def.'s Ex. 8], at 120.  Sturley informed Boynton of her discovery; Boynton, in turn, reported the issue to her supervisor; and Boynton's supervisor then reported it to Defendant's Chief Executive Officer ("CEO").  Def.'s Ex. 4 at 65–68.  The CEO and Boynton's supervisor then directed Boynton to audit Plaintiff's e-mail account.  *Id.* at 67.

The audit revealed Plaintiff had been using her work e-mail account for unauthorized activities, against Defendant's policy.  The audit uncovered dozens of e-mails and documents Plaintiff sent from her work e-mail account, during work hours, related to Wired Cycling, including architect's drawings, floor plans, an application for a building variance with the city, information about bank loans, and letters of neighborhood support for the studio.  Def.'s Stmt. ¶ 61; Pl.'s Resp. ¶ 61; Def.'s Ex. 4 at 71; Def.'s Exs. at 263–505 (Exs. 34–46).  The audit's results were reported to the CEO, who made the decision to terminate Plaintiff's employment.  Def.'s Stmt. ¶ 58; Pl.'s Resp. ¶ 58; Def.'s Ex. 4 at 66–67; *see* Def.'s Reply, ECF No. 24-1 [hereinafter

Def.'s Reply Exs.], at 1–6 [hereinafter Def.'s Ex. 51], at 40.   According to Boynton, the CEO

decided to fire Plaintiff because

> [s]he was upset at the use of the Endocrine Society's tools and
> technology.  She was upset at the performance over[ ]time that had
> been reported to her by the management and the marketing
> department.  And the whole package, I think, just represented to her
> somebody whom she did not have confidence in that had the
> Endocrine Society's business best interest in mind.

Def.'s Ex. 51 at 40.

On January 8, 2015—while Plaintiff was still on FMLA leave—Boynton sent Plaintiff a

letter notifying her that her employment had been terminated, effective immediately.  Def.'s Mot.

at 6; Pl.'s Opp'n, ECF No. 23-18 [hereinafter Pl.'s Ex. 16].   The letter stated the reasons for

Plaintiff's termination as follows:

> In addition to ongoing, documented concerns about poor work
> performance, a recent audit of our ES systems revealed your
> extensive and long-term use of the organization's business
> resources, including your labor hours, ES IT systems,
> copiers/scanners and office facilities, to run at least two personal
> businesses (Long & Associates, LLC, Wired Cycling).  In addition,
> we have evidence of your application for other employment.

Pl.'s Ex. 16.  In light of the termination letter, Plaintiff did not return to work.  Pl.'s Stmt. ¶ 97;

Def.'s Resp. ¶ 97.

## B.      Procedural Background

Plaintiff filed this action in early 2016, alleging that Defendant's decision to terminate her

employment while she was on leave interfered with her right to take leave under the FMLA and

its D.C. counterpart, the D.C. Family and Medical Leave Act ("DCFMLA"), D.C. Code § 32–501,

et seq., and was in retaliation for taking approved leave (Counts I–IV).  Am. Compl., ECF No. 4

[hereinafter Am. Compl.], ¶¶ 26–42.  Plaintiff further claims that Defendant improperly classified

her as an "exempt" employee ineligible for overtime pay protections under the Fair Labor

Standards Act ("FLSA"), 29 U.S.C. § 201, et seq., and, because of this improper classification, she is entitled to overtime wages pursuant to the D.C. Minimum Wage Revision Act ("DCMWRA"), D.C. Code § 32–1001, et seq., the D.C. Wage Payment and Collection Law ("DCWPCL"), D.C. Code § 32–1301, et seq., and the FLSA (Counts V–VII). Am. Compl. ¶¶ 43–49, 55–61. Additionally, Plaintiff asserts that Defendant failed to pay out vacation hours upon her termination in violation of the DCWPCL (Count VI). Am. Compl. ¶ 54. Defendant moves for summary judgment as to all Counts in Plaintiff's Amended Complaint.

## III.  LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "genuine dispute" of a "material fact" exists when the fact is "capable of affecting the substantive outcome of the litigation" and "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Elzeneiny v. District of Columbia*, 125 F. Supp. 3d 18, 28 (D.D.C. 2015).

In assessing a motion for summary judgment, the court considers all relevant evidence presented by the parties. *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 495 (D.C. Cir. 2008). The court looks at the facts in the light most favorable to the nonmoving party and draws all justifiable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). If the court determines "no reasonable jury could reach a verdict in her favor," then summary judgment is appropriate. *Wheeler v. Georgetown University Hosp.*, 812 F.3d 1109, 1113 (D.C. Cir. 2016). Courts are "not to make credibility determinations or weigh the evidence." *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006).

## IV.    DISCUSSION

The court begins with Plaintiff's retaliation and interference claims under the FMLA and DCFMLA, then turns to her overtime and wage claims under the FLSA and D.C. statutes.

### A.    Plaintiff's Claims Under the FMLA and the DCFMLA

Under the FMLA, an employee may take family or medical leave without fear of losing her job.  29 U.S.C. §§ 2612(a)(1), 2614.  The FMLA grants any eligible employee 12 weeks of leave during a 12-month period to care for a spouse, child, or parent with a serious health condition.  *Id.* § 2612(a)(1).  Similarly, the DCFMLA provides any eligible employee 16 weeks of leave during any 24-month period to care for a family member with a serious health condition.  D.C. Code § 32–502(a)(4).

The FMLA and DCFMLA provide causes of action for individuals whose leave was interfered with, or who suffered discrimination or retaliation for taking leave.  29 U.S.C. § 2615(a); D.C. Code § 32–507.  The first category of claims prohibits employers from interfering with, restraining, or denying the exercise of or the attempt to exercise any right provided by the statute.  29 U.S.C. § 2615(a)(1); D.C. Code § 32–507(a).  The second category makes it unlawful for an employer to discharge or otherwise discriminate against an employee for exercising her statutory rights.  29 U.S.C. § 2615(a)(2); D.C. Code 32–507(b).

Because courts interpret the FMLA and DCFMLA in the same manner, *see Cobbs v. Bluemercury, Inc.*, 746 F. Supp. 2d 137, 142 (D.D.C. 2010), this court will address Plaintiff's FMLA and DCFMLA claims in tandem, and, for ease of reference, refers only to the FMLA for the remainder of the opinion.  The court first analyzes Plaintiff's retaliation claims, and then turns to her interference claims.

### 1.    *Retaliation Claims*

A plaintiff suing for wrongful retaliation under the FMLA may rely on a "single motive" theory of liability or, possibly, a "mixed motive" theory of liability.  *See Gordon v. U.S. Capitol Police*, 778 F.3d 158, 162 (D.C. Cir. 2015); *see also Elzeneiny v. District of Columbia*, 195 F. Supp. 3d 207, 220–21 (D.D.C. 2016).

It is well established that plaintiffs suing under the FMLA can proceed under a "single motive" theory of liability.  Under that theory, an employer is liable if a plaintiff proves her protected activity was the sole reason for the adverse employment action.  *See Ponce v. Billington*, 679 F.3d 840, 844 (D.C. Cir. 2012).   When a plaintiff alleges that taking FMLA leave was the but-for cause of her termination, the court analyzes her claim under the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Gordon*, 778 F.3d at 162.   Under this framework, the plaintiff bears the burden of proving a prima facie case of retaliation; if she does so, the burden shifts to the employer to provide a legitimate, non-discriminatory reason for the employment action.  *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53 (1981).  If the employer presents such a justification, the burden shifts back to the plaintiff to show that the employer's stated reasons were not its actual reasons, but were pretext for discrimination.  *See Brady*, 520 F.3d at 494.  In the summary judgment context, however, once an employer puts forward a legitimate, nondiscriminatory reason for an employment action, the prima facie case "is no longer relevant, and thus disappears and drops out of the picture."  *Id.* at 493–94 (internal quotation marks omitted).  In that circumstance, the court need only consider whether plaintiff has produced sufficient evidence for a reasonable jury to find that her employer's asserted reasons for her termination were not the actual reasons and that the real reason was

because she took FMLA leave.  *Brady*, 520 F.3d at 494, 496 n.4; *see also Gleklen v. Democratic Cong. Campaign Comm.*, 199 F.3d 1365, 1367–68 (D.C. Cir. 2000).

It is less clear whether a plaintiff may succeed on an FMLA retaliation claim under a "mixed motive" theory of liability.  Under the theory, an employer is liable if an employee shows she was retaliated against for multiple reasons, one of which is taking FMLA leave.  *Ponce*, 679 F.3d at 844; *Price Waterhouse v. Hopkins*, 490 U.S. 228, 260 (1989).  A recent Supreme Court decision casts doubt on whether a mixed motive claim is available in a FMLA retaliation action. In *University of Texas Southwestern Medical Center v. Nassar*, the Supreme Court held that the mixed motive theory of liability is available when pursuing a Title VII discrimination claim, but not a Title VII retaliation claim. 570 U.S. ___, ___, 133 S. Ct. 2517, 2533 (2013).  To reach its holding, the Court pointed to language in the status-based anti-*discrimination* provision of the Civil Rights Act of 1964—which prohibits an employer from using race, color, religion, sex, or national origin as a "motivating factor" in an adverse employment action—and noted that the same "motivating factor" language is not in the statute's anti-*retaliation* provision.  *Id.* at 2525–28. Neither the Supreme Court nor the D.C. Circuit has decided whether this preclusion of the mixed motive theory in the Title VII retaliation context extends to FMLA retaliation claims, *see Breeden v. Novartis Pharm. Corp.*, 646 F.3d 43, 49 (D.C. Cir. 2011), and district courts in other circuits have reached different results, *see Nigh v. Sch. Dist. of Mellen*, 50 F. Supp. 3d 1034, 1054 (W.D. Wis. 2014) (collecting cases).  Assuming such a theory of liability is possible, "once a plaintiff . . . shows that [discriminatory animus] played a motivating part in an employment decision, the [employer] may avoid a finding of liability only by proving that it would have made the same decision even if it had not allowed [discriminatory animus] to play such a role." *Ford v. Mabus*, 629 F.3d 198, 203–04, 207 (D.C. Cir. 2010).

Plaintiff advances a "single motive" theory of liability and, in the alternative, raises a "mixed motive" theory of liability. Pl.'s Opp'n at 8–10. Under Plaintiff's single motive theory, she contends that Defendant fired her because she took FMLA leave. Am. Compl. ¶ 31. Under her mixed motive theory, Plaintiff's argument, although not precisely articulated, is that her taking FMLA leave was an impermissible factor in the termination of her employment. Pl.'s Opp'n at 9–10.[3] For the reasons that follow, the court concludes Plaintiff cannot succeed on either a single motive theory of liability or, assuming it is possible, a mixed motive theory of liability. *Cf. Elzeneiny*, 195 F. Supp. 3d at 221.

Plaintiff offers five facts or assertions to support her position that Defendant fired her in retaliation for taking FMLA leave: (1) she was on leave at the time she was fired; (2) Defendant's reasons for terminating her employment have been inconsistent over time; (3) similarly situated employees were treated more favorably than Plaintiff; (4) Defendant violated its own policy by failing to place Plaintiff on a formal performance improvement plan prior to terminating her employment; and (5) Defendant had a negative view of Plaintiff taking FMLA leave. The court addresses each of these in turn.

First, Plaintiff argues that Defendant's decision to fire her while she was on leave is evidence of retaliation. Pl.'s Opp'n at 10, 14. The record does reflect that Plaintiff was given authorization to take leave for 12 weeks starting December 22, 2014, and Defendant terminated her employment, effective immediately, on January 8, 2015. Def.'s Ex. 33; Pl.'s Ex. 16. While temporal proximity between an employment action and protected activity is evidence of pretext, it

---

[3] The court does not view Defendant's explanation for terminating Plaintiff—her poor work performance *and* her misuse of company time and equipment—as "independent reasons" for her termination, such that she "must cast doubt on each reason to overcome summary judgment." *DeJesus v. WP Co. LLC*, 841 F.3d 527, 533 (D.C. Cir. 2016). Rather, drawing all inferences in favor of Plaintiff, the court treats the two reasons as "so 'intertwined' that they should be considered as one." *Id.*; *see also Thomas v. District of Columbia*, No. 13-1551, 2016 WL 7496720, at *10 (D.D.C. Dec. 30, 2016) (treating multiple reasons for termination as "intertwined").

alone is not enough at the summary judgment stage to overcome an employer's non-discriminatory explanation; plaintiff must present additional evidence "to defeat the presumption that the proffered explanations are genuine." *Woodruff v. Peters*, 482 F.3d 521, 530 (D.C. Cir. 2007); *Butler v. D.C. Hous. Fin. Agency*, 593 F. Supp. 2d 61, 66 n.13 (D.D.C. 2009); *see Gleklen*, 199 F.3d at 1368. Thus, the fact that Plaintiff was on FMLA leave when she was fired, by itself, is not enough to get past summary judgment.

Next, Plaintiff points to alleged inconsistencies in Defendant's reasons for her termination as evidence of pretext and retaliatory intent. Pl.'s Opp'n at 15. To demonstrate pretext, an employee may point to "changes and inconsistences in the [employer's] stated reasons for the adverse action." *Brady*, 520 F.3d at 495 n.3. To rebut Defendant's claim that Plaintiff was terminated for substandard work, Plaintiff offers her December 2013 performance review, in which her supervisor gave her an overall performance rating of "exceeds expectations." Pl.'s Opp'n, ECF No. 23-11 (Ex. 9); Pl's Opp'n at 15. Plaintiff's year-end 2013 review does not, however, call into question Defendant's explanation that her poor work throughout *2014* led to her termination. There is ample, unrebutted evidence that Defendant found Plaintiff's work to be unsatisfactory during 2014, warned Plaintiff about her inadequate performance, and gave her direction for improvement. *See, e.g.*, Def.'s Ex. 14; Def.'s Exs. at 188–92 (Ex. 17); Def.'s Ex. 18; Def.'s Exs. at 196–97 (Ex. 19). The record reflects that Defendant remained dissatisfied with Plaintiff's performance as late as mid-December 2014, as Plaintiff continued to receive admonishments about her work and did not complete tasks assigned to her. Def.'s Stmt. ¶¶ 45–47; Pl.'s Resp. ¶¶ 45–47; Def.'s Exs. at 231–43 (Exs. 27–29). A stale 2013 review does not call into question the proffered explanation that Plaintiff's consistently shoddy work in 2014 led to her firing.

Plaintiff further provides the testimony of two coworkers to rebut Defendant's claim that she was doing poorly at work. Plaintiff offers the testimony of two of her coworkers, Lakeisha Dames, who said Plaintiff "performed well," and Cheretta Clerkley, who testified that Plaintiff "had a lot of competency in the job that she was doing." Pl.'s Opp'n at 15; Pl.'s Opp'n, ECF No. 23-19 [hereinafter Pl.'s Ex. 17], at 66; Pl.'s Opp'n, ECF No. 23-20 [hereinafter Pl.'s Ex. 18], at 29. However, the record reflects that neither had sufficient first-hand knowledge of the quality of Plaintiff's work to render an informed opinion on that issue. At the time Plaintiff worked for Defendant, Dames was a payroll and benefits coordinator and specialist who did not work directly with Plaintiff. Pl.'s Ex. 17 at 65, 91–92. Dames' view of Plaintiff's performance was solely based on her memory of reading Plaintiff's formal performance evaluations, which Dames was charged with maintaining for all employees. *Id.* at 58–60, 66, 89. Dames, therefore, can only testify to what she remembers the performance reviews said, not to any first-hand knowledge of the quality of Plaintiff's work. Similarly, although Clerkley was employed in the marketing department and sometimes worked with Plaintiff, the evidence on the record does not include any detailed testimony from her about Plaintiff's work performance; Clerkley merely said "[Plaintiff] had a lot of competency in the job she was doing." Pl.'s Ex. 18 at 29. Clerkley neither personally evaluated Plaintiff nor discussed Plaintiff's performance with Jannsen or Sturley, yet she knew that Jannsen and Sturley were "not happy" with Plaintiff's work quality. Def.'s Reply Exs. at 7–12 (Ex. 52), 48–50; Def.'s Reply Exs. at 13–18 (Ex. 53), at 93–103. Given their lack of direct knowledge, Plaintiff's coworkers' general statements regarding Plaintiff "reflect at most a personal opinion or sympathy insufficient for a reasonable jury to conclude that [Defendant's] explanation is pretext for retaliation." *Pardo-Kronemann v. Donovan*, 601 F.3d 599, 611 (D.C. Cir. 2010) (internal quotation marks and alteration omitted). Plaintiff's efforts to demonstrate her work excellence do

not show pretext and do not demonstrate that retaliatory animus was a motivating factor in the decision to terminate her employment.

Next, Plaintiff attempts to "cast doubt" on Defendant's other reason for firing her—running personal businesses during work hours and using company resources. *See Brady*, 520 F.3d at 495 n.3. She argues that Defendant had no policy prohibiting her from using her laptop for personal use. Pl.'s Opp'n at 15. That argument, however, characterizes the reason for her termination too narrowly. Defendant's termination letter states that it fired Plaintiff in part due to her "extensive and long-term use of the organization's business resources, including [her] labor hours, ES IT systems, copiers/scanners and office facilities, to run at least two personal businesses"; not merely for her using her laptop for personal use. Pl.'s Ex. 16. Jannsen confirmed this. She testified that the determinative factor in the decision to terminate Plaintiff's employment was the fact that Plaintiff spent excessive work hours conducting personal business *and* used Defendant's equipment—not just the laptop—to do so. Def.'s Ex. 6 at 75. In any event, Plaintiff has failed to establish that the personal use of her employer's laptop was not the actual reason for her termination *and* that the actual reason was the exercise of her FMLA rights. *See Brady*, 520 F.3d at 495–96 & n.4. Plaintiff rightly points out that Defendant's personnel policy permits some personal use of its computer systems, Pl.'s Opp'n at 15; *see* Def.'s Ex. 7 at 21–22, and that other employees used the company's computers for personal reasons, *see* Pl.'s Ex. 17 at 52–53; Pl.'s Ex. 18 at 22–24. Yet, it is undisputed that Plaintiff was an at-will employee and that, as an at-will employee, Defendant reserved the right to immediately terminate her employment for "misuse of . . . property belonging to [Defendant]," "[w]asting . . . or misusing [Defendant's] material or time," or "[u]nauthorized use of [Defendant's] equipment or material." Def.'s Ex. 7 at 12–13. Therefore, this is not the type of case in which pretext might be inferred from applying an unwritten

rule or disregarding a written one.  *Cf. Christian Legal Soc. Chapter of the Univ. of California, Hastings Coll. of the Law v. Martinez*, 561 U.S. 661, 737–38 (2010) (Alito, J., dissenting) (collecting cases); *Mitchell v. Nat'l Railroad Passenger Corp.*, 407 F. Supp. 2d 213, 245 (D.D.C. 2005) (holding that employer's failure to follow its own policies constituted evidence of pretext).

Third, Plaintiff argues that similarly situated employees were treated more favorably than she was, which supports a finding of pretext.  Pl.'s Opp'n at 15; *Brady*, 520 F.3d at 495.  To establish that she is similarly situated to another employee who was not disciplined, Plaintiff had to show that "she and the alleged similarly-situated employee 'were charged with offenses of comparable seriousness,' and 'that all of the relevant aspects of [her] employment situation were nearly identical to those of the other employee.'"  *Wheeler*, 812 F.3d at 1115–16 (citation omitted). Plaintiff has not presented a similarly situated employee that the court can properly use as a comparator.  Although Plaintiff contends that it was common practice for employees to use company resources for personal use, Pl.'s Opp'n at 15, she has not identified another employee who was using the organization's e-mail, resources, and work hours in a similar manner—i.e., to operate two personal businesses. Def.'s Exs. at 263–64 (Ex. 34); Def.'s Exs. at 408–63 (Ex. 45); Def.'s Exs. at 505 (Ex. 46).  Nor has she presented other evidence relevant to the comparability inquiry, such as the comparator's job duties and by whom such employees were supervised.  *See Burley*, 801 F.3d at 301.  In fact, the only evidence before the court of a similarly situated employee, at least in terms of offending conduct, cuts against Plaintiff.  Julie Boynton, the HR director, testified that Defendant previously terminated an employee for running a personal business during the work day using an Endocrine Society e-mail account.  Def.'s Ex. 51 at 36–38. Plaintiff has provided no evidence that similarly situated employees were treated differently, so her argument on this point fails.

Fourth, Plaintiff argues that pretext can be inferred because Defendant violated its own progressive discipline policy by not placing Plaintiff on a formal performance improvement plan prior to her termination. Pl.'s Opp'n at 15; *see Greer v. Paulson*, 505 F.3d 1306, 1319 (D.C. Cir. 2007) ("an employer's violation of its procedures can be evidence of pretext"); *see also Brady*, 520 F.3d at 495 n.3. However, the record makes clear that Defendant was not wedded to a strict performance improvement system. As an initial matter, Plaintiff's employment was "at will and for an indefinite term." Def.'s Ex. 7 at 9. Consequently, Defendant could terminate Plaintiff's employment at any time. The Staff Handbook in use during Plaintiff's employment roughly outlines a progressive discipline policy—which moves from informal discussions with an employee's supervisor regarding work performance; to a formal discussion accompanied with a written document outlining a plan; onto a written discussion in which the supervisor closely documents performance issues; and, finally to an ultimate conclusion. Def.'s Ex. 7 at 10–11. However, the Handbook states that the organization may start the process at any step. *Id.* Further, the Handbook explicitly states, "The Endocrine Society reserves the right to skip a step or terminate a staff member at any time when, in the opinion of [Endocrine Society] management, termination is in the best interest of the Society." *Id.* at 10. Boynton confirmed this meant that "if there's an incident where the individual does something that is significant in the eyes of the organization, they can elect to terminate that individual without warning or notice." Def.'s Ex. 51 at 54. Other witnesses corroborated Boynton's testimony. *See* Pl.'s Opp'n, ECF No. 23-13 [hereinafter Pl.'s Ex. 11], at 75–76; Pl.'s Opp'n, ECF No. 23-21 (Ex. 19), at 47–49, 54–55; Pl.'s Opp'n, ECF No. 23-23 (Ex. 21), at 51–55. Thus, Plaintiff's contention that her employer was required to discipline her in a progressive manner, and it terminated her employment without doing so, is belied by the very policy on which she relies.

Further, the record shows that Plaintiff's supervisors did follow a progressive disciplinary approach with Plaintiff—at least with respect to her poor work performance. It is undisputed that Plaintiff had several meetings with her supervisors regarding her performance over the course of 2014. Jannsen first met informally with Plaintiff in May 2014, showing Plaintiff examples of her poor work product. She then held additional informal discussions with Plaintiff in the fall of 2014, following up with specific feedback and to-do lists. Def.'s Ex. 6 at 57–69; Def.'s Exs. at 234–41 [hereinafter Def.'s Ex. 28]. Throughout 2014, Jannsen documented Plaintiff's performance issues, consulted with the head of the marketing department, and worked with HR. Def.'s Ex. 6 at 57–69; Def.'s Ex. 13; Def.'s Exs. at 204–06 (Ex. 23). An e-mail from Jannsen to Sturley in September 2014 shows that Defendant intended to take a methodical approach with respect to Plaintiff's deficiencies.

> Since it is review season we have the opportunity to further document performance insufficiencies and make a case for PIP or termination if things don't turn around quickly. I've always gotten the sense that [Plaintiff] is a dedicated employee who generally cares about her work but just hasn't proven to be successful. I'm not sure if this is due to the constant family/personal distractions or if she is truly incapable of doing the work to the required standards. Either way, I don't think it will take long to learn once the current family issue has come to conclusion.

Def.'s Exs. at 149–52 (Ex. 12). As late as December 2014, the record shows Jannsen informally working with Plaintiff to improve her work. *See* Def.'s Ex. 24; Def.'s Exs. at 231–33 (Ex. 27); Def.'s Ex. 28. In short, it is clear from the record that Plaintiff's supervisors followed a path of progressive discipline and that the decision to terminate her immediately came about because of Defendant's discovery of Plaintiff's misuse of company time and resources.

Finally, Plaintiff points to statements—contained in deposition testimony and in two e-mails—made by her immediate supervisor, Jannsen, as evidence of retaliatory motive.[4]  Pl.'s Opp'n at 16; *Brady*, 520 F.3d at 495 n.3 (citing "discriminatory statements by the decisionmaker" as way to show pretext).  These statements do not, however, support Plaintiff's claim.  Plaintiff cites deposition testimony from Jannsen that Plaintiff "was absent a lot"; her "dad was very ill, and her mom had dementia and was difficult to manage"; and that her parents were living with her.  Pl.'s Opp'n at 16 (quoting Pl.'s Ex. 11).  Plaintiff also identifies testimony in which Jannsen observed that she and others had to "shoulder a lot of [Plaintiff's] responsibilities because [Plaintiff] wasn't meeting expectations."  *See id.*  None of Jannsen's statements, however, exhibit hostility to Plaintiff's FMLA leave requests.  Rather, all are neutral factual statements describing either the circumstances that gave rise to Plaintiff's FMLA leave requests or the impact Plaintiff's inferior work quality had on others.  Additionally, Plaintiff points to two e-mails from Jannsen as evidence of pretext.  In one, Jannsen asked Plaintiff to take annual or sick leave rather than FMLA leave because it was easier to track the hours.  Pl.'s Opp'n at 16 (citing Pl.'s Opp'n, ECF No. 23-24 (Ex. 22)).  In the other, Jannsen commented to Sturley, after Plaintiff complained about being penalized for taking leave, that "[Plaintiff's] reaching . . . [and] she's telling a big story about her parents but she had no problem going on staff trips whenever possible."  Pl.'s Opp'n at 16 (quoting Pl.'s Opp'n, ECF No. 23-25 (Ex. 23)).  The e-mails do not advance Plaintiff's cause.  They are instead the kind of stray statements unconnected to the decision to terminate Plaintiff's employment made by someone not involved in that adverse decision, from which the court would

---

[4] Plaintiff additionally argues that after Plaintiff complained in September 2013 to Dames and Boynton about Sturley's use of company gift cards for personal use, Sturley and Jannsen conspired to document Plaintiff's allegedly poor performance to later use as a reason to fire her.  Pl.'s Opp'n at 3–4.  Plaintiff's criticism of Sturley in September 2013, however, provides no probative evidence of retaliatory motive.  After all, Plaintiff did not even seek FMLA leave until more than a year later in October 2014.  While events preceding her leave request might show animus in general, they provide no support for animus based on the exercise of her FMLA rights.

not permit a jury to infer discriminatory intent.  *Cf. Morris v. McCarthy*, 825 F.3d 658, 669–70 (D.C. Cir. 2016) (collecting cases).   The cited e-mails were written in mid- to late December 2014—*before* Jannsen went on vacation and *before* Sturley discovered Plaintiff's heavy use of the company's e-mail system to run outside businesses.   Sturley, in turn—not Jannsen—took the discovery to Defendant's CEO, who made the decision to fire Plaintiff.  At bottom, Jannsen's e-mail statements are so disconnected from the events that led to the decision to terminate Plaintiff's employment that they cannot support an intent to retaliate against her.

*     *     *

To summarize, Defendant has provided ample evidence to rebut both the "motivating factor" and "but-for causation" methods for establishing liability.  The undisputed record evidence shows that Plaintiff's poor performance laid the groundwork for disciplinary action and possible termination.  Although Defendant did not formally place Plaintiff on a performance improvement plan, it did informally make efforts to identify Plaintiff's deficiencies and recommend ways for improvement.   Defendant's discovery of Plaintiff's excessive use of company equipment to operate two outside businesses prompted the decision to terminate her.  Given the long paper trail tracking Defendant's concerns with Plaintiff's work performance and extensive evidence of Plaintiff's misuse of company resources, the court concludes that no reasonable jury could infer that Defendant retaliated against Plaintiff for taking FMLA leave by terminating her employment.

2.     *Interference Claims*

The FMLA guarantees employees who take leave the right to return to their employment upon the leave's conclusion.  *See* 29 U.S.C. § 2614(a); 29 C.F.R. § 825.214.  The statute offers a cause of action to employees whose employers interfere with that right.   *See* 29 U.S.C. § 2615(a)(1).   To prove interference under the FMLA, Plaintiff must show that Defendant

19

"interfered with, restrained, or denied the exercise thereof or the attempt to exercise, any right provided by the FMLA, and that she was prejudiced thereby." *McFadden v. Ballard Spahr Andrews & Ingersoll, LLP*, 611 F.3d 1, 6 (D.C. Cir. 2010) (citations and internal quotation marks omitted).  Although terminating a person's employment necessarily interferes with the person's rights under the statute, an employer is not liable for interference with FMLA rights if it can prove it would have fired the employee even if she had not taken leave. *Bacon v. Hennepin Cty. Med. Ctr.*, 550 F.3d 711, 715 (8th Cir. 2008); *see also Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955, 961 (10th Cir. 2002).  Put another way, the FMLA does not "protect an employee's job against a legitimate, unrelated, reason for separation from employment." *Hopkins v. Grant Thornton Int'l*, 851 F. Supp. 2d 146, 155 (D.D.C. 2012), *aff'd sub nom. Hopkins v. Grant Thornton, LLP*, 529 F. App'x 1 (D.C. Cir. 2013).

The D.C. Circuit has not addressed which party bears the burden of proving interference when an employee is denied the right to return to the same or equivalent position as when the employee's leave commenced.   Of those federal appellate courts to have addressed the issue, all but one has held that the employer must prove that it had a legitimate reason to deny the employee reinstatement. *See Sanders v. City of Newport*, 657 F.3d 772, 780 (9th Cir. 2011) (collecting cases from the Eighth, Ninth, Tenth, and Eleventh Circuits).  The one circuit court to take a different approach has applied the *McDonnell Douglas* framework and held that, once the employer proffers a legitimate reason for not reinstating the employee, the employee bears the ultimate burden of proving she would not have been discharged if she had not taken FMLA leave. *See Rice v. Sunrise Express, Inc.*, 209 F.3d 1008, 1018 (7th Cir. 2000).

This court need not take a side in the debate, however, because no matter who bears the burden of proof, Defendant is entitled to summary judgment on Plaintiff's interference claim.  As

outlined above, there is no genuine dispute of fact as to whether Plaintiff would have been fired if she had not taken leave.  The record is replete with evidence that, before taking leave, Defendant was dissatisfied with Plaintiff's performance for an extended period and took efforts to address her shortcomings without seeing significant or lasting improvement.  Then, while Plaintiff was on leave, Defendant uncovered Plaintiff's misuse of Defendant's resources during work hours, which prompted the CEO to terminate her employment.  Consequently, even assuming Defendant bears the burden of showing it had a legitimate reason to deny Plaintiff reinstatement, on this factual record, no reasonable jury could conclude Plaintiff's termination constituted interference with her right to take FMLA leave.[5]

### B.       Whether Plaintiff Was Properly Classified as an Exempt Employee

Next, Plaintiff contends that Defendant improperly classified her as an exempt employee and, thus, failed to pay her overtime wages, in violation of D.C. and federal law.  Plaintiff claims she traveled to conferences for work three months out of the year and worked in excess of 40 hours per week during those trips.  Pl.'s Opp'n at 2–3, 22–23.  While she received compensation time towards her annual leave for those hours, she claims she should have been paid overtime wages.  *Id.* at 2–3; Def.'s Ex. 8 at 78–79; Def.'s Stmt. ¶¶ 8–9; Pl.'s Resp. ¶¶ 8–9.

An employee is entitled to time-and-a-half pay for hours worked beyond 40 hours per week unless specifically exempted by the FLSA.  29 U.S.C. § 207(a)(1); *Robinson-Smith v. Gov't Emp. Ins. Co.*, 590 F.3d 886, 892 (D.C. Cir. 2010).  The Act exempts, among others, those who work "in a bona fide executive, administrative, or professional capacity . . . as such terms are defined and delimited from time to time by regulations of the Secretary [of Labor]."  29 U.S.C. § 213(a)(1).  The DCMWRA contains the same exemption.  *See* D.C. Code § 32-1003(c); 32-1004(a)(1)

---

[5] For the reasons stated, the court also enters summary judgment in favor of Defendant on Plaintiff's retaliation and interference claims under the DCFMLA.  *Cobbs*, 746 F. Supp. 2d at 142.

(exempting those "employed in a bona fide executive, administrative, or professional capacity . . . as these terms are defined by the Secretary of Labor under . . . the [FLSA]").  For ease of reference, the court refers to this exemption—applicable to both the federal and state statute—as "the EAP exemption."  Because the parties agree that FLSA standards govern Plaintiff's DCMWA claim, Pl.'s Opp'n at 25, Def.'s Reply at 23–24, the court will address Plaintiff's FLSA claims in conjunction with her D.C. law claims and will refer only to the FLSA for the remainder of the opinion.

Courts are to construe the EAP exemption narrowly, and the employer bears the burden of demonstrating that the employee is exempt.  *Cannon v. District of Columbia*, 717 F.3d 200, 204 (D.C. Cir. 2013).  The Department of Labor regulations set forth a "standard duties test" to determine whether an employee is exempt.  *See* 29 C.F.R. § 541.200(a); *see also Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees*, 69 Fed. Reg. 22,122, 22,137 (Apr. 23, 2004) (codified at 7 C.F.R. pt. 541) (describing the standard duties test).[6]  Under the test, an employee is exempt from overtime if she satisfies three criteria:  (1) the employee is "compensated on a salary or fee basis at a rate of not less than $455 per week" ($23,660 annually);[7] (2) her "primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers"; and (3) her "primary duty includes the exercise of

---

[6] The parties agree that this test is applicable in this case.  *See* Pl.'s Opp'n at 19 n.5; Def.'s Reply at 18 n.9.  Though the parties refer to this test as the "short test," the Department of Labor revised the FLSA overtime exemption requirements in 2004 and thereafter referred to the test as the "standard duties test."  *See Defining and Delimiting the Exemptions*, 69 Fed. Reg. at 22,126, 22,137.  Accordingly, the court likewise will refer to the test as the "standard duties test."

[7] The court recognizes that, in May 2016, the Department of Labor issued a final rule that revises the first prong of the standard duties test.  That rule is currently enjoined nationwide, *see Nevada v. United States Dep't of Labor*, 218 F. Supp. 3d 520, 534 (E.D. Tex. 2016), but even were it to be in effect, the revised standard duties test would not govern this court's analysis.  The overtime hours at issue here occurred before the start of 2015, and the standard duties test in effect at that time governs the court's analysis.

discretion and independent judgment with respect to matters of significance."   29 C.F.R. § 541.200(a); 69 Fed. Reg. at 22,123; *see also Radtke v. Lifecare Mgmt. Partners*, 795 F.3d 159, 163 (D.C. Cir. 2015).

The parties agree that Plaintiff satisfies the first prong of the standard duties tests.  *See* Pl.'s Opp'n at 19; Def.'s Mot. at 22.   Accordingly, the court need only assess whether Plaintiff has satisfied the second and third prongs.

### 1.      Whether Plaintiff Performed an Administrative Function

Put simply, the second prong of the standard duties test requires the employer to demonstrate that the employee's primary responsibility was to perform administrative work related to the general running of the business.  *See* 29 C.F.R. § 541.200(a)(2).  Specifically, the prong requires that an employee's "primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers."  *Id.*  An employee's "primary duty" is the main duty the employee performs, "with the major emphasis on the character of the employee's job as a whole."  *Id.* § 541.700(a).  This part of the test is satisfied if the employee's work is "directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment."  *Id.* § 541.201(a).   Work related to management or business operations includes "accounting," "budgeting," "purchasing," "procurement," "advertising," "marketing," "human resources," "public relations," and "internet and database administration."  *Id.* § 541.201(b).

Defendant contends that Plaintiff's duties were directly related to its management and business operations because she managed marketing for its most valuable asset—its journals. Def.'s Mot. at 23–25; *see also* Def.'s Ex. 3 at 1.  Plaintiff responds that, although her job

description sounds lofty, her day-to-day tasks actually were menial.  Pl.'s Opp'n at 21.  She characterizes her daily activities as "more akin to clerical work and filling out prior templates and samples."  *Id.*  She says she used templates for ads, journal subscription renewal e-mails and letters, and marketing plans.  *Id.* at 21–22.  The record, however, demonstrates that Plaintiff's work was more substantive than she admits.  Plaintiff was responsible for marketing Defendant's publications, including its journals, which brought in $18 million per year, the organization's largest source of revenue.  *See* Def.'s Stmt. ¶ 3; Pl.'s Resp. ¶ 3; Def.'s Ex. 3; Def.'s Ex. 4 at 64; Def.'s Ex. 8 at 81.  According to Plaintiff's job description, Plaintiff was responsible for "developing [profit and loss] statements for new products, creating and implementing marketing plans, managing the budget, reporting sales[,] and managing product inventory."  Def.'s Ex. 3. Although a job description is not dispositive of whether an employee performs an administrative function, Plaintiff confirmed that she placed ads in journals, acquired new journal subscriptions and managed renewals, prepared profit and loss statements, and created marketing plans and budgets as part of her work.  Def.'s Ex. 8 at 84–90, 92–93; *Defining and Delimiting the Exemptions*, 69 Fed. Reg. at 22,187.  Department of Labor regulations categorize this type of work—budgeting, advertising, and marketing—as typical of the work of an exempt administrative employee.  29 C.F.R. § 541.201(b).  Although Plaintiff claims she mostly worked off templates and used boilerplate language, Pl.'s Opp'n at 21–22, the record shows that her supervisor repeatedly urged her to be more creative and adapt previous templates to reflect the organization's current needs.  *See* Def.'s Ex. 14.  Plaintiff cannot use her lack of effort or exercise of creativity to argue that her job was menial.  Accordingly, Defendant has satisfied the second prong of the standard duties test.

######## 2.    *Whether Plaintiff Exercised Discretion and Independent Judgment*

The final prong of the standard duties test requires that the employee's primary duty include "the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a)(3).  The D.C. Circuit has divided this prong into three sub-parts, requiring the defendant to demonstrate that the employee's primary duty (a) "includes work requiring the exercise of discretion and independent judgment (as distinguished from the mere use of skill in applying well established techniques) and that the discretion is exercised"; (b) "free from immediate supervision"; and (c) "with respect to matters of significance."  *Robinson-Smith*, 590 F.3d at 893.  Exercising discretion "involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." 29 C.F.R. § 541.202(a).  An employee's degree of discretion is assessed "in the light of all the facts involved in the particular employment situation," including:

> whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact . . . whether the employee has authority to negotiate and bind the company on significant matters . . . [and] whether the employee is involved in planning long- or short-term business objectives.

29 C.F.R. § 541.202(b).

Defendant argues that Plaintiff's position managing marketing for the publications division is "central to the development and success of [Defendant]'s highest revenue generating division— a matter of utmost significance," such that the third prong is satisfied.  Def.'s Mot. at 25–27. Plaintiff counters that she did not exercise discretion and independent judgment in her role because she was closely supervised on a daily basis, did not have final approval to make decisions,

supervised no employees, and Defendant has offered no evidence that Plaintiff could negotiate and bind the company on significant matters.  Pl.'s Opp'n at 2, 24–25.

The undisputed facts in the record show that that Plaintiff's job involved the exercise of discretion and independent judgment in matters of significance.  *See, e.g.*, Def.'s Ex. 3; Def.'s Ex. 14.  Plaintiff was in charge of marketing Defendant's largest stream of revenue—its journals.  Def.'s Ex. 3.  Her job duties included developing a marketing strategy—which involved brainstorming ways to target journal subscribers, reach out to prospective authors, manage the journal subscription and renewal process, and use social media—creating her division's budget, and writing website content and product descriptions.  Def.'s Ex. 3; Def.'s Ex. 28.  Additionally, Plaintiff was responsible for writing and sending marketing e-mails; ordering books and other products from the warehouse to sell at meetings, placing printing orders, and correcting and finalizing advertisements.  Def.'s Ex. 10; Def.'s Ex. 14.  These tasks are not the type of "mechanical, repetitive, recurrent or routine work" that the Labor Department regulations contemplate for non-exempt employees.  29 C.F.R. § 541.202(e).

Plaintiff points to Jannsen's close oversight of Plaintiff's work to support her claim that she was not free from supervision, but that argument fails for two reasons.  First, although the third prong of the standard duties test requires that the employee must have the authority to make an independent choice, free from immediate supervision, an employee nevertheless still may be exempt "even if their decisions or recommendations are reviewed at a higher level."  *Id.* § 541.202(c).  Thus, the mere fact of supervision, close or otherwise, is not dispositive.  Second, the record facts establish that Plaintiff's close supervision was due to her own shortcomings, not the lack of autonomy in her position.  *See, e.g.*, Def.'s Ex. 6 at 49; Def.'s Ex. 14.  For example, in an e-mail to Sturley on October, 10, 2014, Jannsen recounted a conversation she had with Plaintiff

two days prior in which Jannsen tried to impress upon Plaintiff that she needed to "take initiative, write proper marketing plans, . . . and to be more independent of me."  Def.'s Ex. 14.  In an e-mail to Plaintiff on the same day, Jannsen wrote, "As we discussed, we were hoping to start fresh on all of these projects and get you to a place where you were able to perform the duties required of the position, including taking ownership and initiative for the planning and implementation of marketing efforts related to journals and [publications]."  Id.  Similarly, in Jannsen's notes tracking Plaintiff's work performance, she specifically identified several projects that Plaintiff was expected to complete on her own, such as the marketing plan, budget, ads, e-mails, and flyers, but Jannsen and others "had to provide a lot of feedback or direct projects to completion."  Def.'s Ex. 13.  As Jannsen succinctly put it, Plaintiff had "[t]oo much reliance on managerial staff to provide direction, creativity, thought."  Id.  Plaintiff cannot bootstrap her own poor work performance into non-exempt status because her employer, with good reason, deemed it necessary to monitor her work closely.

Plaintiff's own testimony also contradicts her assertion that she was merely operating at others' direction.  Plaintiff testified that she helped to teach Jannsen her position when Jannsen started because she had no publishing background.  Def.'s Ex. 8 at 83–84.  According to Plaintiff, the head of the department told Plaintiff she needed to "manage up" to bring Jannsen up to speed.  Def.'s Ex. 8 at 87–88.  The responsibility to "manage up" would not be conferred upon an employee who lacks judgment and discretion with respect to matters of import to her employer.

In sum, the record makes clear that Plaintiff was expected to exercise significant discretion and independent judgment in her position, and her job was directly related to the management or

general business operations.   Accordingly, she was properly classified as an exempt employee under the FLSA and no reasonable jury could find otherwise.[8]

## V.   CONCLUSION

As there is no genuine dispute of material fact regarding any of Plaintiff's claims, the court grants summary judgment for Defendant on all counts.   A separate Order accompanies this Memorandum Opinion.


Dated:  July 13, 2017                                  Amit P. Mehta
                                                       United States District Judge

---

[8] As for Plaintiff's claim that Defendant failed to pay out her vacation upon her termination, the record shows that Defendant paid Plaintiff for all accrued annual leave in her last paycheck.  *See* Def.'s Exs. at 112–139 (Ex. 9); Def.'s Reply Exs. at 31–33 (Def.'s Ex. 57).